THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

_____

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | Case No. 3:20-cv-00950 |
| ) | |
| v. ) | |
| ) | |
| HYDRITE CHEMICAL CO. ) | |
| ) | |
| Defendant. ) | |
| ) | |

_____)

## COMPLAINT

Plaintiff, the United States of America, by authority of the Attorney General of the

United States and through the undersigned Attorneys, acting at the request of the Administrator

of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges

as follows:

## NATURE OF THE ACTION

1.      This is a civil action brought by the United States against Defendant Hydrite

Chemical Co. ("Hydrite") for injunctive relief and the assessment of civil penalties for violations

of Section 113 of the Clean Air Act (the "CAA"), 42 U.S.C. § 7413, at Hydrite's chemical

blending and manufacturing facility located at 114 North Main Street, Cottage Grove, Wisconsin

(the "Facility").  Hydrite has violated regulatory requirements imposed by National Emission

Standards for Hazardous Air Pollutants ("NESHAP") promulgated pursuant to CAA Section

112, 42 U.S.C. § 7412, as well as requirements imposed by permits for the Facility issued

pursuant to the federally enforceable CAA State Implementation Plan (the "Wisconsin SIP") and

the CAA Title V permit program adopted by the State of Wisconsin and approved by EPA

pursuant to CAA Sections 110 and 501-507, 42 U.S.C. §§ 7410 and 7661-7661f.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over the subject matter of this civil action pursuant to CAA Section 113, 42 U.S.C. § 7413, and 28 U.S.C. §§ 1331, 1345, and 1355.

3.      Venue is proper in this district pursuant to CAA Section 113, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b), (c), and 1395(a), because the violations of the CAA giving rise to this complaint occurred and are occurring at Hydrite's Facility in this district.

## NOTICE

4.      In accordance with CAA Section 113(a)(1), 42 U.S.C. § 7413(a)(1), EPA issued Hydrite a Notice and Finding of Violation on June 30, 2017 (the "Violation Notice"), and simultaneously sent a copy of the Violation Notice to the Wisconsin Department of Natural Resources.  The Violation Notice alleged violations of several NESHAPs, CAA permits, and the Wisconsin SIP at the Facility.

5.      The United States has provided notice of the commencement of this action to the State of Wisconsin pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b).

## THE DEFENDANT

6.      Hydrite owns and operates a chemical blending and manufacturing facility located at 114 North Main Street, Cottage Grove, Wisconsin.

7.      The Facility is also a Resource Conservation and Recovery Act ("RCRA") licensed treatment, storage, and disposal facility that manages and processes hazardous waste material that is generated off-site, such as spent solvents provided by other companies.

8.      Hydrite's operations at the Facility result in the emission of air pollutants that are regulated under the CAA, including volatile organic compounds ("VOCs") and hazardous air pollutants ("HAPs").

9.      Hydrite is a corporation formed under the laws of the State of Wisconsin and does business in Wisconsin.

10.     Hydrite is a "person" as defined in CAA Sections 113(b) and 302(e), 42 U.S.C. §§ 7613(b) and 7602(e).

11.     The Facility is a "stationary source" as defined in CAA Sections 113(b) and 302(z), 42 U.S.C. §§ 7613(b) and 7602(z).

12.     Hydrite is an "owner or operator" of the Facility within the meaning of CAA Section 113(b), 42 U.S.C. §§ 7613(b).

## STATUTORY AND REGULATORY BACKGROUND

### National Emission Standards for Hazardous Air Pollutants

#### *1.     General*

13.     CAA Section 112 sets forth a national program for the control of HAPs. 42 U.S.C. § 7412.  As originally promulgated in the Clean Air Act Amendments of 1970, Section 112 directed EPA to publish a list of HAPs.  A HAP was defined as "an air pollutant to which no ambient air quality standard is applicable and which in the judgment of the Administrator may cause, or contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness."  42 U.S.C. § 1857c-7 (1971).  At that time, Congress directed EPA to establish HAP standards that provided "an ample margin of safety to protect the public health from such hazardous air pollutant."  *Id.*

14.     Between 1970 and 1990, EPA listed eight substances as hazardous air pollutants and promulgated emission standards for seven of them.  H.R. Rep. No. 101-490, 101st Cong., 2d Sess., pt 1 at 151 (1990).  Of relevance to this action, EPA issued standards relating to volatile hazardous air pollutants from equipment leaks, found in Title 40 of the Code of Federal Regulations, Part 61, Subpart V.  40 C.F.R. §§ 61.240–61.247.

15.     Through the Clean Air Act Amendments of 1990, Congress replaced the then-existing Section 112 and established a new program for the control of HAPs.  H.R. Rep. No. 101-490, 101st Cong., 2d Sess., pt 1 at 324 (1990).  The regulations then in existence under the original Section 112 remained in full force and effect.

16.     With the 1990 amendments, Congress itself established a list of 189 hazardous air pollutants believed to cause adverse health or environmental effects.  42 U.S.C. § 7412(b)(1).

17.     Congress directed EPA to publish a list of all categories and subcategories of, *inter alia*, major sources of HAPs.  42 U.S.C. § 7412(c).

18.     A "major source" of HAPs was and is defined as any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs.  42 U.S.C. § 7412(a)(1).

19.     A "stationary source" was and is defined as any building, structure, facility, or installation which emits or may emit any air pollutant.  42 U.S.C. § 7412(a)(3) (stating that "stationary source" under Section 112(a) has the same meaning as that term has under Section 111(a) of the CAA, 42 U.S.C. § 7411(a)(3)).

20.     A "category" of sources is a group of sources having some common features suggesting that they should be regulated in the same way and on the same schedule.  57 Fed. Reg. 31576, 31578 (July 16, 1992).  A single stationary source can be comprised of multiple source categories.  *Id*.

21.     Congress directed EPA to promulgate regulations establishing emission standards for each category or subcategory of, *inter alia*, major sources of HAPs.  42 U.S.C. § 7412(d)(1). These emission standards must require the maximum degree of reduction in emissions of HAPs that the Administrator, taking into consideration the cost of achieving such emission reduction,

and any non-air quality health and environmental impacts and energy requirements, determines

is achievable for the new or existing sources in the category or subcategory to which the

emission standard applies.  42 U.S.C. § 7412(d)(2).

22.     To the extent that it is not feasible to prescribe or enforce an emission standard for

control of a HAP, Congress authorized EPA to promulgate "design, equipment, work practice, or

operational" standards, which are to be treated as emission standards.  42 U.S.C. § 7412(h).

23.     The emission standards promulgated under the 1990 Amendments to CAA

Section 112, 42 U.S.C. § 7412, are known as the "NESHAPs" ("National Emission Standards for

Hazardous Air Pollutants") for Source Categories or "MACT" ("maximum achievable control

technology") standards.  These emission standards are found in Part 63 of Title 40 of the Code of

Federal Regulations.

24.     After the effective date of any emission standard, limitation, or regulation

promulgated pursuant to CAA Section 112, no person may operate a source in violation of such

standard, limitation, or regulation.  42 U.S.C. § 7412(i)(3).

### 2.     *MACT General Provisions – 40 C.F.R. Part 63, Subpart A*

25.     Pursuant to CAA Section 112, 42 U.S.C. § 7412, EPA has promulgated

regulations that contain general provisions applicable to sources that are subject to MACT

standards.  40 C.F.R. Part 63, Subpart A, §§ 63.1–63.16 ("Subpart A").

26.     Under Subpart A, the provisions of 40 C.F.R. Part 63 "apply to the owner or

operator of any stationary source that (i) emits or has the potential to emit any hazardous air

pollutant listed in or pursuant to section 112(b) of the Act; and (ii) is subject to any standard,

limitation, prohibition, or other federally enforceable requirement established pursuant to this

part."  40 C.F.R. § 63.1(b)(1).

27.     Subpart A defines the term "fugitive emissions" as "those emissions from a stationary source that could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening."  Subpart A also specifies that "[u]nder section 112 of the Act, all fugitive emissions are to be considered in determining whether a stationary source is a major source."  40 C.F.R. § 63.2.

### 3.     The Off-Site Waste and Recovery Operations NESHAP – 40 C.F.R. Part 63, Subpart DD

#### a.     General

28.     Pursuant to CAA Section 112(c), 42 U.S.C. § 7412(c), EPA identified off-site waste and recovery operations as a category of sources of HAPs.  57 Fed. Reg. 31,591 (Table 1) (July 16, 1992) (identifying the category as "Solid Waste Treatment, Storage, and Disposal Facilities (TSDF)"); 59 Fed. Reg. 51,918 (Oct. 13, 1994) (changing the name of the category to "Off-Site Waste and Recovery Operations").

29.     Pursuant to CAA Section 112(d), 42 U.S.C. § 7412(d), EPA promulgated the NESHAP for Off-Site Waste and Recovery Operations at 40 C.F.R. Part 63, Subpart DD. 40 C.F.R. §§ 63.680 – 63.697.  These regulations are commonly referred to as the "OSWRO MACT" or "Subpart DD."

30.     Subpart DD applies to the owner and/or operator of a plant that is a major source of HAPs when the plant is the location of a waste management operation that receives off-site material and the operation is regulated as a hazardous waste treatment, storage, and disposal facility under either 40 C.F.R. Part 264 or 265.  40 C.F.R. § 63.680(a)(1), (2).

31.     A "waste management operation" is the collection of off-site material management units, process vents, and equipment components used at a plant site to manage an off-site material stream from the point-of-delivery to the point where the waste exits or is

discharged from the plant site or the waste is placed for on-site disposal in a unit not subject to Subpart DD.  40 C.F.R. § 63.681.

32.     The "affected source" to which Subpart DD applies is, *inter alia*: (i) equipment leaks, *id.* § 63.680(c)(3); and (ii) the entire group of off-site material management units associated with the operation, which units include tanks, *id.* § 63.680(c)(1).

33.     Equipment means a pump, compressor, agitator, pressure relief device, sampling connection system, open-ended valve or line, valve, connector, or instrumentation system that contains or contacts off-site material having a total HAP concentration equal to or greater than 10 percent by weight and is intended to operate for 300 hours or more during a calendar year in off-site material service.  *Id.* § 63.680(c)(3)(i)–(iii).

34.     A tank is a stationary unit that is constructed primarily of nonearthen materials (such as wood, concrete, steel, fiberglass, or plastic) which provide structural support and is designed to hold an accumulation of liquids or other materials.  *Id.* § 63.681.

35.     Subpart DD establishes general standards for owners and operators of affected sources, *id*. § 63.683, as well as specific standards for several sources of potential emissions from those operations, including equipment leaks, *id*. § 63.691, and tanks, *id*. § 63.685.

### b.       The Equipment Leak Standards of Subpart DD

36.     Owners and operators of equipment subject to Subpart DD must implement the leak detection and repair ("LDAR") control measures found in Subpart DD at 40 C.F.R. § 63.691.  *Id*. § 63.683(d).

37.     Under 40 C.F.R. § 63.691, owners and operators of equipment subject to leaks may choose among two options for compliance.  *Id*. § 63.691(b).  They may comply with the equipment leak standards of either 40 C.F.R. Part 63, Subpart H (40 C.F.R. §§ 63.162–63.182) or

Part 61, Subpart V (40 C.F.R. §§ 61.242–61.247).  For purposes of the claims in this Complaint, the relevant requirements of each of these Subparts are the same.

38.     Except during pressure releases, the owner or operator of each pressure relief device in gas/vapor service must operate the device with an instrument reading of less than 500 parts per million ("ppm") VOCs above background.  40 C.F.R. § 63.165(a) (Subpart H); *id.* § 61.242-4(a) (Subpart V).  These requirements apply to pressure release devices on tanks subject to Subpart DD, as well as pressure relief devices on other types of equipment covered by Subpart DD.

39.     The method for measuring emissions of VOCs from a pressure relief device is Method 21, found in 40 C.F.R. Part 60, Appendix A.  40 C.F.R. § 63.180(c)(1) (Subpart H); *id.* § 61.245(c)(1) (Subpart V).

40.     Method 21, at 40 C.F.R. Part 60, Appendix A-7, Meth.21, Section 8.3.1, requires the owner or operator of an affected source to do as follows:

> Place the probe inlet [of the portable instrument that is capable of detecting emissions from equipment] at the surface of the component interface where leakage could occur.  Move the probe along the interface periphery while observing the instrument readout.  If an increased meter reading is observed, slowly sample the interface where leakage is indicated until the maximum meter reading is obtained.  Leave the probe inlet at this maximum reading location for approximately two times the instrument response time.  If the maximum observed meter reading is greater than the leak definition in the applicable regulation, record and report the results [as a leaking component].

### c.     *The Tank Standards of Subpart DD*

41.     Owners and operators of tanks subject to Subpart DD may choose among three options for compliance.  40 C.F.R. § 63.683(b)(1).  Of relevance to this Complaint, one of the compliance options is compliance with the specific standards for tanks found in Subpart DD at 40 C.F.R. § 63.685.  *Id.* § 63.683(b)(1)(i).

42.     The Subpart DD emission control requirements for tanks depend in part on whether the tanks are required to use "Level 1" or "Level 2" controls.  Of relevance to this Complaint, the Level 1 control options include: (i) equipping the tank with a fixed roof and closure devices that form a continuous barrier over the entire surface area of the liquid in the tank; and (ii) equipping the tank with a fixed roof, closure devices, and a closed-vent system that vents tank emissions to a control device such as a thermal oxidizer.  40 C.F.R. §§ 63.685(c), 63.902(b).

43.     A transfer system associated with a Subpart DD-regulated tank also must be equipped with emission controls under Subpart DD, such as a cover, closure devices, and a closed-vent system that vents vapors to a control device.  40 C.F.R. § 63.689.

44.     Except in limited circumstances, closure devices on Subpart DD-regulated tanks must be secured in a closed position.  40 C.F.R. §§ 63.685(g)(2), 63.902(c).

45.     Subpart DD imposes special design and operation requirements, as well as inspection and monitoring requirements, for closed-vents systems and control devices that receive vented emissions from regulated tanks and transfer systems.  40 C.F.R. §§ 63.685(g), 63.689(c)(3), 63.693, 63.695.  Among other requirements, Subpart DD specifies that closed-vent system components and connections must be monitored in accordance with Method 21 to demonstrate that the system operates with no detectable organic emissions.  40 C.F.R. §§ 63.693(c), 63.694(k), 63.695(c).

### 4.      The Organic Liquids Distribution NESHAP – 40 C.F.R. Part 63, Subpart EEEE

46.     Pursuant to CAA Section 112(d), 42 U.S.C. § 7412(d), EPA promulgated the National Emission Standards for Hazardous Air Pollutants for Organic Liquids Distribution (Non-Gasoline) at 40 C.F.R. Part 63, Subpart EEEE.  40 C.F.R. §§ 63.2330 – 63.2406.  These regulations are commonly referred to as the "OLD MACT" or "Subpart EEEE."

47.     40 C.F.R. § 63.2334 states that owners and operators of an organic liquids distribution operation that is located at, or is part of, a major source of HAPs, is subject to the requirements of Subpart EEEE, with certain exceptions not relevant here.  40 C.F.R. § 63.2338(a) further states that Subpart EEEE is applicable to new, reconstructed, or existing organic liquids distribution operations.

48.     Subpart EEEE establishes emission standards, recordkeeping requirements, and requirements to demonstrate initial and continuous compliance with emission limits, operating limits, and work practice standards for covered organic liquids distribution operations.

### 5.     The Miscellaneous Organic Chemical Manufacturing NESHAP – 40 C.F.R. Part 63, Subpart FFFF

49.     Pursuant to CAA Section 112(c), 42 U.S.C. § 7412(c), EPA identified several organic chemical manufacturing processes as a category of sources of HAPs.  57 Fed. Reg. 31,576, 31,591 (Table 1) (July 16, 1992).  Several of these source categories were combined into one broad source category called Miscellaneous Organic Chemical Manufacturing.

50.     Pursuant to CAA Section 112(d), 42 U.S.C. § 7412(d), EPA regulated this source category under what it called the National Emission Standards for Organic Hazardous Air Pollutants from Miscellaneous Organic Chemical Manufacturing, found at 40 C.F.R. Part 63, Subpart FFFF.  40 C.F.R. §§ 63.2430-63.2550.  These provisions commonly are referred to as the "Miscellaneous Organic NESHAP," the "MON," or "Subpart FFFF."

51.     The "affected source" to which standards of Subpart FFFF apply is the facility-wide collection of miscellaneous organic chemical processes units ("MCPUs") and heat exchange systems, wastewater, and waste management units that are associated with manufacturing materials described in 40 C.F.R. § 63.2435(b)(1).  40 C.F.R. § 63.2440(b).

52.     "Miscellaneous organic chemical manufacturing process" means all equipment which collectively function to produce a product or isolated intermediate that is specifically described in 40 C.F.R. § 63.2435(b).  40 C.F.R. § 63.2550.

53.     "Miscellaneous organic chemical manufacturing process unit" means the process equipment and any assigned storage tanks, product transfer racks, equipment in open systems that is used to convey or store water having the same concentration and flow characteristics as wastewater, and components such as pumps, compressors, agitators, pressure relief devices, sampling connection systems, open-ended valves or lines, valves, connectors, and instrumentation systems that are used to manufacture any material or family of material described in 40 C.F.R. § 63.2435(b)(1).

54.     Subpart FFFF applies to any MCPU that is located at a major source; produces material or a family of materials described in 40 C.F.R. § 63.2435(b)(1)(i)-(v); processes, uses or produces any of the organic HAPs listed in Section 112(b) of the CAA, 42 U.S.C. § 7412(b); and is not an affected source or part of any affected source under another Subpart of Part 63 (with certain exceptions not relevant here).  40 C.F.R. § 63.2435(b)(1).

55.     Under Subpart FFFF, affected sources that existed prior to November 10, 2003, were required to be in compliance with Subpart FFFF by no later than May 10, 2008.  40 C.F.R. 63.2445(b).

56.     Subpart FFFF establishes emission standards, recordkeeping requirements, and requirements to demonstrate initial and continuous compliance with emission limits, operating limits, and work practice standards for covered MPCUs, wastewater treatment and conveyance systems, transfer operations, and associated ancillary equipment.

### 6.    *Violation of the NESHAPs*

57.     After the effective date of any emission standard, limitation, or regulation promulgated pursuant to CAA Section 112, no person may operate such source in violation of such standard, limitation, or regulation.  42 U.S.C. § 7412(i)(3).

**The National Ambient Air Quality Standards and the Wisconsin SIP**

58.     CAA Section 108(a), 42 U.S.C. § 7408(a), requires EPA to list, and issue air quality criteria for, each air pollutant, the emissions of which may endanger public health or welfare and the presence of which results from numerous or diverse mobile or stationary sources.

59.     An "air pollutant" means "any air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive…substance or matter which is emitted into or otherwise enters the ambient air."  This also includes any precursors to the formation of any air pollutant.  CAA Section 302(g), 42 U.S.C. § 7602(g).

60.     VOCs are a precursor to the formation of ground-level ozone, one of the six designated criteria air pollutants.

61.     CAA Section 109, 42 U.S.C. § 7409, requires EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS" or "ambient air quality standards") for those air pollutants for which air quality criteria have been issued pursuant to CAA Section 108, 42 U.S.C. § 7408 ("criteria pollutants").  Under CAA Section 109(b), 42 U.S.C. § 7409(b), the primary NAAQS are to be adequate to protect the public health with a sufficient margin of safety, and the secondary NAAQS are to be adequate to protect the public welfare from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

62.     Pursuant to CAA Sections 108 and 109, 42 U.S.C §§ 7408 and 7409, EPA has established NAAQS for VOCs, which are codified as part of 40 C.F.R. Part 50.

63.     Under CAA Section 107(d), 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  An area that meets the NAAQS for a particular pollutant is an "attainment" area.  An area that does not meet the NAAQS is a "nonattainment" area.  An area that cannot be classified due to insufficient data is "unclassifiable."

64.     At all times relevant to this Complaint, Hydrite's Facility has been located in an area that has been designated as attainment for VOCs.

65.     Pursuant to CAA Section 110, 42 U.S.C. § 7410, each state must adopt and submit to EPA for approval a State Implementation Plan that provides for the attainment and maintenance of the NAAQS, and that meets other requirements of the CAA.

66.     Once EPA approves a SIP, the SIP also is independently enforceable by the federal government under Section 113 of the CAA, 42 U.S.C. § 7413.

67.     CAA Section 110(a)(2)(C), 42 U.S.C. § 7410(a)(2)(C), requires each SIP to include "regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program. . . ."

68.     In 1995, EPA approved Wis. Admin. Code Chapter NR 406 as part of the federally enforceable SIP for Wisconsin.  The approved provisions implemented the construction permit program in the State of Wisconsin.  40 C.F.R. § 52.2570(c)(75), 60 Fed. Reg. 3,538 (Jan. 18, 1995).

69.     In 1995, EPA also approved Wis. Admin. Code Chapter NR 407 as part of the federally enforceable SIP for Wisconsin.  The approved provisions implemented the operating

permit program in the State of Wisconsin.  40 C.F.R. § 52. 2570(c)(76), 60 Fed. Reg. 3,538 (Jan. 18, 1995).

70.     In 2008, EPA approved revisions to the Wisconsin SIP that provide various Wisconsin construction permit rules for stationary sources.  73 Fed. Reg. 12,893 (Mar. 11, 2008).

71.     A violation of SIP requirements, including requirements of permits issued in accordance with a SIP, is a violation of CAA Section 110, 42 U.S.C. § 7410, and is federally enforceable under CAA Section 113(a)(1), 42 U.S.C. § 7413(a)(1).

**Title V**

72.     CAA Title V, 42 U.S.C. § 7661-7661f, establishes an operating permit program for certain sources of air pollution, including "major sources."  The purpose of Title V is to ensure that all "applicable requirements" for compliance with the CAA, including SIP requirements, are collected in one permit.  42 U.S.C. § 7661c(a).

73.     Pursuant to CAA Section 502(b), 42 U.S.C. § 7661a(b), EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a Title V permit program to be administered by any state or local air pollution control agency. 57 Fed. Reg. 32,250 (July 21, 1992).  EPA's regulations implementing CAA Title V are codified at 40 C.F.R. Part 70.  In Wisconsin, a source that is required to have a Title V permit is sometimes referred to as a "Part 70 Source."

74.     Under Title V, a "major source" is defined to include, among other things, a "major stationary source" as defined in 42 U.S.C. § 7602.  The term "major stationary source" is defined at 42 U.S.C. § 7602 to mean, in pertinent part, "any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant[.]"

14

75.     Under Title V, "potential to emit" is defined as:

"[t]he maximum capacity of a stationary source to emit any air pollutant under its physical and operational design.  Any physical or operational limitation on the capacity of a source to emit an air pollutant, including air pollution control equipment and restriction on hour of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation is enforceable by the Administrator."

40 C.F.R. § 70.2.

76.     Pursuant to CAA Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), and the implementing regulations at 40 C.F.R. § 70.7(b), after the effective date of any permit program approved or promulgated under Title V of the CAA, no person may operate a major source except in compliance with a Title V permit.

77.     EPA granted final approval of Wisconsin's CAA Title V Permit Program, effective November 30, 2001.  66 Fed. Reg. 62,951 (Dec. 4, 2001); 40 C.F.R. Part 70, Appendix A.  On February 28, 2006, EPA granted Wisconsin final approval on revisions to its CAA Title V Permit Program, effective March 30, 2006.  71 Fed. Reg. 9,934 (Feb. 28, 2006).

78.     The Wisconsin SIP provisions encompassing its CAA Title V Permit Program are found at Wis. Admin. Code Chapter NR 407, which specifies operating permit requirements for stationary sources of air contaminants.

79.     Any noncompliance with a Wisconsin operating permit issued pursuant to the SIP constitutes a violation of the Wisconsin SIP and is grounds for enforcement action; permit suspension; revocation or revision; or denial of a permit renewal application.  Wis. Admin. Code § NR 407.09(1)(f)(1).

80.     Terms and conditions of a Title V permit are federally enforceable, except as specified in the permit.  42 U.S.C. § 7413(b); 40 C.F.R. § 70.6(b).  In Wisconsin, Title V permits typically state:  "Conditions of the permit marked with an asterisk (*) have been created outside

of Wisconsin's federally approved State Implementation Plan (SIP) and are not federally

enforceable."

**Hydrite's Clean Air Act Permits**

81.     Hydrite has obtained various Clean Air Act construction permits pursuant to the

Wisconsin SIP that impose federally enforceable emission limitations and other conditions for air

pollutant emission sources at the Facility.

82.     Hydrite also has obtained a Clean Air Act operating permit for the Facility – as

well as periodic renewals and modifications to that operating permit – pursuant to the Wisconsin

SIP and Wisconsin's Title V permit program.

         a.      Hydrite obtained its original operating permit for the Facility in 1999,

which was identified as Operation Permit No. 113063390-P01.

         b.      Hydrite then obtained Operation Permit No. 113063390-P10, which was

in effect from May 1, 2008 to September 8, 2011.

         c.      Hydrite then obtained Operation Permit No. 113063390-P12, which was

in effect from September 9, 2011 to April 18, 2017.

         d.      Hydrite then obtained Operation Permit No. 113063390-P20, which was

in effect from April 19, 2017 to May 21, 2018.

         e.      Hydrite then obtained Operation Permit No. 113063390-P21, which was

in effect from May 22, 2018 to May 20, 2019.

         f.      Hydrite then obtained Operation Permit No. 113063390-P23, which took

effect on May 21, 2019 and remains in effect.

These permits are referred to collectively herein as the Facility's "Operation Permit."

83.     In Operation Permit No. 113063390-P10 and all subsequent versions of the

Facility's Operation Permit, HAP emissions from the Facility were limited to no more than:

(i) 1,666 pounds per month (10 tons per year) of any individual HAP; and (ii) 4,166 pounds per month (25 tons per year) of all HAPs combined.

a.  In these versions of the Operation Permit, a note accompanying this permit condition states:  "This limit was proposed by the facility to ensure that they are a synthetic minor source of federal HAPs.  The facility must be sure that they include the emissions from all processes, tanks and fugitive emission sources at the facility which use HAPs regulated under section 112(b) of the Clean Air Act, in determining compliance with this emission limit."

b.  Another note in Operation Permit No. 113063390-P10 states: "The facility is a minor source of HAP's therefore will not be subject to the NESHAPs (MACT) 40 CFR part 63, subpart FFFF, for Miscellaneous Organic Chemical Manufacturing (MON)."

84.  At all times relevant to this Complaint, the Facility's Operation Permit required Hydrite to detect and minimize VOC and HAP emissions from equipment leaks through an LDAR program that included periodic Method 21 monitoring.

85.  At all times relevant to this Complaint, the Facility's Operation Permit required Hydrite to prepare and maintain and update a written plan to calculate the VOC and HAP emissions for each emission unit at the Facility, including updating the plan at least every five years and whenever there were changes that would affect emissions from a unit.

86.  At all times relevant to this Complaint, the Facility's Operation Permit required Hydrite to calculate the monthly VOC emissions from all sources at the Facility, including fugitive loss emissions calculated in accordance with the Facility's LDAR program and EPA's *1995 Protocol for Equipment Leak Emissions Estimate*s.

87.     At all times relevant to this Complaint, the Facility's Operation Permit required Hydrite to calculate the monthly HAP emissions from all sources at the Facility, including fugitive loss emissions calculated in accordance with the Facility's LDAR program and EPA's *1995 Protocol for Equipment Leak Emissions Estimates*.

88.     At all times relevant to this Complaint, the Facility's Operation Permit incorporated requirements derived from the Wisconsin SIP for:  (i) periodic Method 21 monitoring of emissions from carbon canisters used as control devices for certain tanks at the Facility, including tanks T162 and T173; and (ii) replacement of spent carbon canisters that were no longer functioning as effective control devices for those tanks.

89.     At all times relevant to this Complaint, the Facility's Operation Permit incorporated pertinent requirements of Subpart DD that govern HAP emissions from processing off-site waste materials, including the above-described Subpart DD equipment leak standards and tank standards.

     a.     The Facility's Operation Permit reflects Hydrite's election to comply with the Subpart DD leak standards by controlling HAP emissions from equipment leaks in accordance with the Method 21 monitoring and associated LDAR requirements of Subpart H.

     b.     The Facility's Operation Permit documents Hydrite's use of closed vent systems and a thermal oxidizer to control emissions from Subpart DD-regulated tanks and associated transfer systems at the Facility.

90.     All Operation Permit terms and conditions referenced in this Complaint are federally enforceable.

**EPA's Inspection and Investigation**

91.      In April 2017, EPA staff performed an LDAR-focused inspection at Hydrite's

Facility and performed a review of Facility records.  EPA staff re-inspected the Facility in March

2019.  Through these investigative efforts, the EPA identified the following alleged violations of

Clean Air Act requirements, which were summarized in EPA's Violation Notice.

  a.      Hydrite failed to conduct proper Method 21 monitoring of carbon canisters

  used as control devices for certain tanks at the Facility, including tanks T162 and T173,

  as required by the Facility's Operation Permit.  Hydrite also failed to replace spent

  carbon canisters that were no longer functioning as effective emission control devices for

  those tanks, as required by the Facility's Operation Permit.

  b.      Hydrite was failing to capture and control emissions from tanks and

  associated transfer systems as required by Subpart DD and the Facility's Operation

  Permit, including by failing to keep closure devices over tank roof openings secured in a

  closed position.

  c.      Hydrite violated applicable LDAR requirements imposed by Subpart DD

  and the Facility's Operation Permit by:  (i) failing to perform required periodic LDAR

  monitoring of certain components; and (ii) failing to inspect and monitor pressure relief

  devices and closed vent systems for tanks and transfer systems subject to Subpart DD

  requirements.

  d.      Hydrite was not properly conducting Method 21 monitoring and

  controlling fugitive emissions from equipment leaks.  Among other things, this violated

  applicable LDAR requirements imposed by Subpart DD and the Facility's Operation

  Permit.

     e.     Hydrite failed to update its written plan for calculating VOC and HAP emissions from emission units at the Facility, as required by the Facility's Operation Permit.

     f.     In 2015 and 2016, Hydrite failed to calculate its Facility-wide VOC and HAP emissions as required by its Operation Permit because the company's calculations did not include any emissions from fugitive losses.

92.     Because Hydrite failed to control fugitive emissions with an effective LDAR program, the Facility emitted more than 25 tons of HAPs per year from at least 2014 to 2017.

     a.     From at least 2014 to 2017, Hydrite therefore violated the synthetic minor limit for HAP emissions in its Operation Permit, referenced above in Paragraph 83.

     b.     Hydrite therefore operated as a major source of HAPs from at least 2014 to 2017.

     c.     As a major source of HAPs from at least 2014 to 2017, Hydrite operated covered equipment in organic liquid distribution operations without complying with various requirements of Subpart EEEE.

     d.     As a major source of HAPs from at least 2014 to 2017, Hydrite operated covered MCPUs at the Facility without complying with various requirements of Subpart FFFF.

**Enforcement of the CAA**

93.     Sections 113(a)(1) and (a)(3) of the CAA, 42 U.S.C. §§ 7413(a)(1) and (a)(3), authorize EPA to bring a civil action under Section 113(b) if EPA finds that a person is in violation of any requirement or prohibition of CAA Title V, 42 U.S.C. §§ 7661-7661f, or any rule or permit issued thereunder, or the Wisconsin SIP or any permit issued thereunder.

94.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the court to enjoin a violation, to require compliance, to assess and recover a civil penalty, and to award any other appropriate relief for each violation.

95.     Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101–410, Oct. 5, 1990, 104 Stat. 890, as amended, 28 U.S.C. § 2461, and 40 C.F.R. § 19.4, the Defendant is liable for civil penalties of up to: (i) $37,500 per day for each violation that occurred between January 13, 2009, and November 2, 2015, inclusive; and (ii) $101,439 per day for each violation that occurred after November 2, 2015.

### FIRST CLAIM FOR RELIEF
(Failure to Monitor and Replace Carbon Canister Tank Emission Control Devices)

96.     Paragraphs 1 through 95 are incorporated herein by reference.

97.     At various times relevant to this Complaint, Hydrite violated its Operation Permit by failing to conduct proper Method 21 monitoring of carbon canisters used as control devices for certain tanks at the Facility.

98.     At various times relevant to this Complaint, Hydrite violated its Operation Permit by failing to replace spent carbon canisters that were no longer functioning as effective control devices for certain tanks at the Facility.

99.     Hydrite's violations of the Clean Air Act, as set forth in this Claim, make Hydrite subject to injunctive relief and civil penalties of up to the inflation-adjusted statutory maximum amounts referenced in Paragraph 95, per day per violation, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b).

### SECOND CLAIM FOR RELIEF
(Failure to Capture and Control Emissions from Tanks Subject to Subpart DD)

100.     Paragraphs 1 through 95 are incorporated herein by reference.

101.    At times relevant to this Complaint, Hydrite failed to capture and control tank emissions as required by Subpart DD and the Facility's Operation Permit, including by failing to keep closure devices over tank roof openings secured in a closed position.

102.    Hydrite's violations of the Clean Air Act, as set forth in this Claim, make Hydrite subject to injunctive relief and civil penalties of up to the inflation-adjusted statutory maximum amounts referenced in Paragraph 95, per day per violation, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b).

### THIRD CLAIM FOR RELIEF
(Failure to Comply with LDAR Requirements)

103.    Paragraphs 1 through 95 are incorporated herein by reference.

104.    At various times relevant to this Complaint, Hydrite violated applicable LDAR requirements imposed by Subpart DD and the Facility's Operation Permit by failing to perform required periodic LDAR monitoring of certain components.

105.    At various times relevant to this Complaint, Hydrite violated applicable LDAR requirements imposed by Subpart DD and the Facility's Operation Permit by failing to conduct proper Method 21 monitoring and control fugitive emissions from equipment leaks.

106.    Hydrite's violations of the Clean Air Act, as set forth in this Claim, make Hydrite subject to injunctive relief and civil penalties of up to the inflation-adjusted statutory maximum amounts referenced in Paragraph 95, per day per violation, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b).

### FOURTH CLAIM FOR RELIEF
(Failure to Comply with Emission Calculation Requirements)

107.    Paragraphs 1 through 95 are incorporated herein by reference.

108.    Hydrite violated its Operation Permit by failing to update its written plan for calculating VOC and HAP emissions from emission units at the Facility.

109.    At various times relevant to this Complaint, Hydrite violated its Operation Permit when its calculations of monthly Facility-wide VOC emissions failed to include emissions from fugitive losses.

110.    At various times relevant to this Complaint, Hydrite violated its Operation Permit when its calculations of monthly Facility-wide HAP emissions failed to include emissions from fugitive losses.

111.    Hydrite's violations of the Clean Air Act, as set forth in this Claim, make Hydrite subject to injunctive relief and civil penalties of up to the inflation-adjusted statutory maximum amounts referenced in Paragraph 95, per day per violation, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b).

**FIFTH CLAIM FOR RELIEF**
(Failure to Comply with Synthetic Minor Emissions Limitation)

112.    Paragraphs 1 through 95 are incorporated herein by reference.

113.    At various times relevant to this Complaint, Hydrite violated its Operation Permit by emitting more than 4,166 pounds per month (25 tons per year) of all HAPs combined.

114.    Hydrite's violations of the Clean Air Act, as set forth in this Claim, make Hydrite subject to injunctive relief and civil penalties of up to the inflation-adjusted statutory maximum amounts referenced in Paragraph 95, per day per violation, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b).

**SIXTH CLAIM FOR RELIEF**
(Failure to Comply with Subpart EEEE)

115.    Paragraphs 1 through 95 are incorporated herein by reference.

116.    At various times relevant to this Complaint, the Facility was a major source of HAPs and Hydrite operated covered equipment in organic liquid distribution operations without complying with various requirements of 40 C.F.R. Part 63, Subpart EEEE.

117.    Hydrite's violations of the Clean Air Act, as set forth in this Claim, make Hydrite subject to injunctive relief and civil penalties of up to the inflation-adjusted statutory maximum amounts referenced in Paragraph 95, per day per violation, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b).

## SEVENTH CLAIM FOR RELIEF
### (Failure to Comply with Subpart FFFF)

118.    Paragraphs 1 through 95 are incorporated herein by reference.

119.    At various times relevant to this Complaint, the Facility was a major source of HAPs and Hydrite operated covered miscellaneous organic chemical processes units at the Facility without complying with various requirements of 40 C.F.R. Part 63, Subpart FFFF.

120.    Hydrite's violations of the Clean Air Act, as set forth in this Claim, make Hydrite subject to injunctive relief and civil penalties of up to the inflation-adjusted statutory maximum amounts referenced in Paragraph 95, per day per violation, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b).

## PRAYER FOR RELIEF

WHEREFORE, based upon all the allegations contained in Paragraphs 1 through 120 above, the United States requests that this Court:

1.    Permanently enjoin Hydrite from operating the Facility except in accordance with the Clean Air Act, as well as all applicable regulatory requirements and Clean Air Act permits;

2.    Order Hydrite to remedy its past and ongoing violations by, among other things, requiring Hydrite to utilize improved emissions monitoring methods and emissions controls for VOCs and HAPs;

3.    Assess a civil penalty against Hydrite up to the inflation-adjusted statutory maximum amounts referenced in Paragraph 95, per day per violation;

4.      Award the United States its costs of this action; and,

5.      Grant such other relief as the Court deems just and proper.

Signature Page for Complaint in *United States v. Hydrite Chemical Co.* (W.D. Wis.)

FOR THE UNITED STATES OF AMERICA:

Karen S. Dworkin
Deputy Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

s/ *Randall M. Stone*
Randall M. Stone
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
202-514-1308
randall.stone@usdoj.gov

Scott C. Blader
United States Attorney
Western District of Wisconsin

Leslie K. Herje
Assistant United States Attorney
Western District of Wisconsin
222 West Washington Avenue
Madison, WI  53703
608-250-5463
leslie.herje@usdoj.gov

OF COUNSEL:

Mary T. McAuliffe
Associate Regional Counsel
U.S. Environmental Protection Agency, Region 5
77 West Jackson Boulevard
Chicago, Illinois 60604

<u>CERTIFICATE OF SERVICE</u>

In accordance with Paragraphs 76 and 89 of the proposed Consent Decree lodged in this case, I certify that on this date I caused copies of the foregoing Complaint to be served on the following individuals by electronic mail:

Cynthia A. Faur
Quarles & Brady LLP
Cynthia.Faur@quarles.com

Thadd Stankowski
General Counsel
Hydrite Chemical Co.
legal@Hydrite.com

Tom Miazga
Executive Director of SQRA
Hydrite Chemical Co.
Tom.Miazga@Hydrite.com

Dated:  October 15, 2020                          <u>*s/ Randall M. Stone*</u>