IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

          v.

HYDRITE CHEMICAL CO.,

      Defendant.

Case No. 3:20-cv-00950

**CONSENT DECREE**

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ..................................................................................2

II.     APPLICABILITY ....................................................................................................3

III.    DEFINITIONS ........................................................................................................4

IV.     CIVIL PENALTY ....................................................................................................6

V.      INJUNCTIVE RELIEF ............................................................................................8

VI.     REPORTING REQUIREMENTS ..........................................................................20

VII.    STIPULATED PENALTIES ..................................................................................22

VIII.   FORCE MAJEURE ...............................................................................................26

IX.     DISPUTE RESOLUTION ......................................................................................28

X.      INFORMATION COLLECTION AND RETENTION ...........................................30

XI.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS................................31

XII.    COSTS ..................................................................................................................33

XIII.   NOTICES ..............................................................................................................33

XIV.    EFFECTIVE DATE ...............................................................................................34

XV.     RETENTION OF JURISDICTION ........................................................................34

XVI.    MODIFICATION ..................................................................................................34

XVII.   TERMINATION....................................................................................................35

XVIII.  26 U.S.C. § 126(f)(2)(A)(ii) IDENTIFICATION..................................................36

XIX.    PUBLIC PARTICIPATION ..................................................................................36

XX.     SIGNATORIES/SERVICE....................................................................................36

XXI.    INTEGRATION ....................................................................................................37

XXII.   APPENDICES .......................................................................................................37

XXIII.  FINAL JUDGMENT .............................................................................................37

## CONSENT DECREE

Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), has filed a Complaint in this action, concurrently with this Consent Decree, alleging that Defendant Hydrite Chemical Co. ("Hydrite") violated the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401-7671q, as well as implementing regulations and permits issued under the CAA, at its chemical blending and manufacturing facility in Cottage Grove, Wisconsin (the "Facility"). EPA outlined these violations in a Notice of Violation and Finding of Violation issued to Hydrite on June 30, 2017 (the "EPA Violation Notice").

Hydrite's Facility is classified as an area source under NESHAP Subpart VVVVVV. Hydrite submitted an initial notification for NESHAP Subpart VVVVVV on February 26, 2010 and a Notification of Compliance Status for NESHAP Subpart VVVVVV on May 10, 2013. NESHAP Subpart VVVVVV requirements are included in the Facility's operation permit.

Hydrite has replaced all manway covers with closure devices meeting the requirements of 40 C.F.R. § 63.685(g) at all affected sources subject to NESHAP Subpart DD, including tanks and equipment leaks. Hydrite has also replaced the pressure relief devices at all NESHAP Subpart DD tanks. The pressure relief devices do not meet the definition of pressure relief device in NESHAP Subpart DD or NESHAP Subpart H. 40 C.F.R. § 63.681, 40 C.F.R. § 63.161.

Hydrite has developed or updated existing training procedures for all Hydrite personnel whose duties include, but are not limited to, operating or inspecting tanks or process equipment to minimize emissions and identify leaks. Hydrite has implemented the new or updated training procedures.

Hydrite does not admit any facts, interpretations of law, or liability to the United States arising out of the transactions, conditions, operations or occurrences alleged in the Complaint or the EPA Violation Notice.

The United States and Hydrite (the "Parties") have agreed to resolve the claims alleged in the Complaint and the EPA Violation Notice on the terms and conditions set forth in this Consent Decree.  Among other things, Hydrite is agreeing to pay a civil penalty, perform a Leak Detection and Repair ("LDAR") audit and periodic LDAR monitoring at the Facility, and maintain federally enforceable limits on the emission of Hazardous Air Pollutants from the Facility.

The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and CAA Section 113(b), 42 U.S.C. § 7413(b), and over the Parties.  Venue lies in this district pursuant to 42 U.S.C. § 7413(b) and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the violations alleged in the Complaint are alleged to have occurred in, and Hydrite conducts business in, this judicial district.  For purposes of this Decree, or any action to enforce this Decree, Hydrite consents to the Court's jurisdiction over this Decree and any such action and over Hydrite and consents to venue in this judicial district.

2.      The State of Wisconsin has actual notice of the commencement of this action in accordance with the requirements of Section 113 of the CAA, 42 U.S.C. § 7413.

II.      APPLICABILITY

3.      The obligations of this Consent Decree apply to and are binding upon the United States, and upon Hydrite and any successors, assigns, or other entities or persons otherwise bound by law.

4.      No transfer of ownership or operation of the Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Hydrite of its obligation to ensure that the terms of the Decree are implemented.  At least 30 Days prior to such transfer, Hydrite shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to EPA Region 5 and the United States Department of Justice, in accordance with Section XIII (Notices).  Any attempt to transfer ownership or operation of the Facility without complying with this Paragraph constitutes a violation of this Decree.

5.      Hydrite shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. Hydrite shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6.      In any action to enforce this Consent Decree, Hydrite shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

3

## III.    DEFINITIONS

7.      Terms used in this Consent Decree that are defined in the CAA or in regulations promulgated pursuant to the CAA shall have the meanings assigned to them in the CAA or such regulations, unless otherwise provided in this Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.      "CAA" means the Clean Air Act, 42 U.S.C. §§ 7401-7671q.

b.      "Calendar Quarter" means the time periods within a given year from: (i) January 1-March 31; (ii) April 1-June 30; (iii) July 1-September 30; and (iv) October 1-December 31.

c.      "Complaint" means the complaint filed by the United States in this action.

d.      "Consent Decree" or "Decree" means this Decree and all appendices attached hereto (listed in Section XXII).

e.      "Day" means a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period runs until the close of business of the next business day.

f.      "Date of Lodging" means the day on which this Consent Decree is lodged with this Court as a proposed settlement, before a public comment period and before this Court's consideration of the Consent Decree.

g.      "Effective Date" has the definition provided in Section XIV.

h.      "EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies.

i.      "EPA Method 21" means EPA's Reference Method 21 for Determination of Volatile Organic Compound Leaks, codified at 40 C.F.R. Part 60, Appendix A-7.

4

j.      "EPA Violation Notice" means the Notice of Violation and Finding of Violation issued to Hydrite by EPA on June 30, 2017 (attached as Appendix A to this Consent Decree).

k.      "Facility" means Hydrite's chemical blending and manufacturing facility located at 114 North Main Street in Cottage Grove, Wisconsin.

l.      "HAP" means Hazardous Air Pollutant as defined under Section 112 of the CAA, 42 U.S.C. § 7412.

m.      "HAP Service" refers to a piece of equipment that either contains or contacts a fluid (liquid or gas) that is at least 5% by weight of total organic HAP for 300 hours or more during the calendar year, and that is subject to LDAR requirements referenced in NESHAP Subpart DD, NESHAP Subpart H, and other applicable requirements (*e.g.*, applicability of regulations to process units and/or specific equipment; leak definitions; monitoring frequencies).

n.      "Hydrite" means Defendant Hydrite Chemical Co.

o.      "NESHAP Subpart DD" means the National Emissions Standards for Hazardous Air Pollutants for Off-Site Waste and Recovery Operations, codified at 40 C.F.R. Part 63, Subpart DD.

p.      "NESHAP Subpart H" means the National Emissions Standards for Organic Hazardous Air Pollutants for Equipment Leaks, codified at 40 C.F.R. Part 63, Subpart H.

q.      "NESHAP Subpart VVVVVV" means the National Emissions Standards for Hazardous Air Pollutants for Chemical Manufacturing Area Sources, codified at 40 C.F.R. Part 63, Subpart VVVVVV.

r.     "Paragraph" means a portion of this Decree identified by an Arabic numeral.

s.     "Parties" means the United States and Hydrite.

t.     "Permits" means all permits for the Facility issued under the CAA or laws or regulations implementing the CAA, including Wisconsin's CAA State Implementation Plan.  The term "Permits" includes, but is not limited to, Operation Permit No. 113063390-P23 for the Facility (the "Current Operation Permit"), as well as any renewal or replacement for the Current Operation Permit.

u.     "ppm" means parts per million.

v.     "RCRA Subpart BB" means the Air Emissions Standards for Equipment Leaks for Owners and Operators of Hazardous Waste Treatment, Storage, and Disposal Facilities regulated under the Resource Conservation and Recovery Act, codified at 40 C.F.R. Part 264, Subpart BB.

w.     "Section" means a portion of this Decree identified by a roman numeral.

x.     "State" means the State of Wisconsin, including but not limited to the Wisconsin Department of Natural Resources.

y.     "tpy" means tons per year.

z.     "VOC" means volatile organic compounds.

aa.     "United States" means the United States of America, acting on behalf of EPA.

## IV.   CIVIL PENALTY

8.     Within 30 days after the Effective Date, Hydrite shall pay the sum of $480,503 as a civil penalty, together with interest accruing from the Date of Lodging, at the rate specified in 28 U.S.C. § 1961 as of the Date of Lodging.

6

9.      Hydrite shall pay the civil penalty due by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account, in accordance with instructions provided to Hydrite by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Western District of Wisconsin after the Effective Date.  The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Hydrite shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Thadd Stankowski
> General Counsel
> Hydrite Chemical Company
> 300 N. Patrick Blvd
> Brookfield, WI 53045
> Email: legal@hydrite.com

on behalf of Hydrite.  Hydrite may change the individual to receive payment instructions on its behalf by providing written notice of such change to the United States and EPA in accordance with Section XIII (Notices).

10.     At the time of payment, Hydrite shall send notice that payment has been made: (i) to EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; (ii) to the United States via email or regular mail in accordance with Section XIII; and (iii) to EPA in accordance with Section XIII.  Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States v. Hydrite Chemical Co.* and shall reference the civil action number, CDCS Number and DOJ case number 90-5-2-1-12229.

11.     Hydrite shall not deduct any penalties paid under this Decree pursuant to this Section or Section VII (Stipulated Penalties) in calculating its federal income tax.

V.     INJUNCTIVE RELIEF

A. <u>LDAR Program</u>

12.     <u>LDAR Program Description</u>.  By no later than 90 Days after the Date of Lodging,

to the extent necessary, Hydrite shall update the Standard Operating Procedures for its Facility

that describe:  (i) the Leak Detection and Repair ("LDAR") Program for the Facility, with

specific attention to how that program applies to all equipment in HAP Service; (ii) the tracking

program (*e.g.*, Management of Change) that ensures that new pieces of equipment added to the

process units are, as applicable, integrated into the LDAR Program and that pieces of equipment

that are taken out of service are, as applicable, removed from the LDAR Program; (iii) the roles

and responsibilities of all employee and contractor personnel assigned to LDAR functions at the

process units; and (iv) how the number of personnel dedicated to LDAR functions is sufficient to

satisfy the requirements of the LDAR Program.

13.     <u>Daily Certification by Monitoring Technicians</u>.  Commencing no later than 30

Days after the Effective Date, on each Day that LDAR monitoring occurs, at the end of such

monitoring, Hydrite shall ensure that each monitoring technician certifies that the data collected

accurately represents the monitoring performed for that Day by requiring the monitoring

technician to sign a form that includes the following, or a substantially similar, certification:

> On [insert date], I reviewed the monitoring data that I collected today and to the best of
>
> my knowledge and belief, the data accurately represents the monitoring that I performed
>
> today.

14.     <u>QA/QC</u>.  Commencing no later than the first full Calendar Quarter after the

Effective Date and continuing through EPA's approval of the Demonstration Period Report, at

times that are not announced to the LDAR monitoring technicians, an LDAR-trained employee

or contractor of Hydrite, who does not serve on a routine basis as an LDAR monitoring

technician at the Facility, shall undertake the following no less than once per Calendar Quarter at the Facility:

      a.      Verify that equipment was monitored at the appropriate frequency;

      b.      Verify that proper documentation and sign-offs have been recorded for all equipment placed on the delay of repair list;

      c.      Ensure that repairs have been performed in the required periods;

      d.      Review monitoring data and equipment counts (*e.g.*, number of pieces of equipment monitored per Day) for feasibility and unusual trends;

      e.      Verify that proper calibration records and monitoring instrument maintenance information are maintained;

      f.      Spot check that LDAR records are maintained as required; and

      g.      Observe in the field each LDAR monitoring technician who is conducting leak detection monitoring to ensure that monitoring during the quarterly QA/QC is being conducted as required.  Each technician shall be observed for a period of time sufficient to ensure that Method 21 is generally being performed properly.

Hydrite shall promptly correct any deficiencies detected or observed.  Hydrite shall maintain a log that: (i) records the date and time that the QA/QC reviews, verifications, and observations required by this Paragraph are undertaken; and (ii) describes the nature and timing of any corrective actions taken.

      15.     <u>LDAR Audit</u>.  Within 30 days of the Effective Date, Hydrite shall retain a qualified third-party contractor to perform a one-time LDAR audit ("LDAR Audit") (the "Auditor"), ensuring that the Auditor is a contractor other than a contractor that normally performs LDAR monitoring at the Facility and the Auditor has experience in conducting LDAR audits.  By no later than 210 Days after the Effective Date, Hydrite shall conduct and complete

the LDAR Audit at the Facility's process units.  The LDAR Audit shall include: (i) reviewing compliance with all applicable LDAR regulations, including all applicable LDAR requirements related to valves, connectors, pumps, agitators, and open-ended lines; (ii) reviewing and/or verifying the same QA/QC items that are required to be reviewed in Paragraph 14, except observation of the LDAR monitoring technician is not required; (iii) reviewing whether any pieces of equipment that are required to be in the LDAR Program are not included; and (iv) "comparative monitoring" as described in Paragraph 16.  The LDAR Audit Report shall be provided to Hydrite by no later than 240 Days after the Effective Date.

16.     Comparative Monitoring.  Comparative monitoring conducted during the LDAR Audit required by Paragraph 15 must be undertaken as follows:

a.      Calculating a Comparative Monitoring Audit Leak Percentage. Equipment shall be monitored in accordance with EPA Method 21, in order to calculate a leak percentage for each process unit, broken down by equipment type (*i.e.,* valves, pumps, agitators, and connectors).  For descriptive purposes under this section, the monitoring that takes place during the LDAR Audit shall be called "Comparative Monitoring" and the leak percentages derived from the Comparative Monitoring shall be called the "Comparative Monitoring Audit Leak Percentages."  In undertaking Comparative Monitoring, Hydrite shall not be required to monitor every component in the process unit.

b.      Calculating the Historic, Average Leak Percentage from Prior Periodic Monitoring Events.

(1)     The historic, average leak percentage from prior periodic monitoring events shall be calculated for each equipment type (*i.e.*, valves (excluding pressure relief valves), pumps, agitators, and connectors).  The

10

following number of complete monitoring periods immediately preceding the Comparative Monitoring shall be used for this purpose:  NESHAP Subpart DD valves or valves associated with bulk storage tanks – four periods; NESHAP Subpart DD pumps and agitators – twelve periods; non-NESHAP Subpart DD pumps and agitators – six periods (to the extent monitoring is available); and connectors and components that are monitored once every three years in accordance with the Current Operation Permit – two periods.

(2)     In calculating the historic, average leak percentage, Hydrite shall not use any repair verification monitoring events for purposes of calculating a quarterly rate.  Accordingly, for valves that have been repaired, Hydrite cannot include the next two monthly readings as part of the total number of quarterly monitoring events.

c.     Calculating the Comparative Monitoring Leak Ratio.  For each type of equipment, the ratio of the Comparative Monitoring Audit Leak Percentage from Subparagraph 16.a to the historic, average leak percentage from Subparagraph 16.b shall be calculated.  This ratio shall be called the "Comparative Monitoring Leak Ratio."  If the denominator in this calculation is "zero," it shall be assumed (for purposes of this calculation but not for any other purpose under this Consent Decree or under any applicable laws and regulations) that one leaking piece of equipment was found in the Unit through routine monitoring during the applicable period referenced in Subparagraph 16.b.

17.     LDAR Audit Report and Corrective Action Plan.

a.     By no later than 270 Days after the Effective Date, Hydrite shall submit the following in accordance with Consent Decree Subsection V.E:  (i) an LDAR Audit

Report, prepared by the Auditor, which summarizes the results of the Audit (addressing each Audit element listed in Paragraph 15) and identifies the date on which the LDAR Audit was completed; and (ii) a certification that no corrective actions were recommended by the LDAR Audit, if applicable.

     b.    <u>Corrective Action Plan</u>.  Hydrite shall develop a Preliminary Corrective Action Plan ("CAP") if:  (i) the results of the LDAR Audit identify any deficiencies; or (ii) a Comparative Monitoring Leak Ratio calculated pursuant to Subparagraph 16.c is 3.0 or higher *and* the Comparative Monitoring Audit Leak Percentage calculated pursuant to Subparagraph 16.a is greater than or equal to 0.5 percent.  The Preliminary CAP shall describe the corrective actions that Hydrite has taken or shall take to address:  (i) the deficiencies and/or (ii) the causes of a Comparative Monitoring Leak Ratio that is 3.0 or higher (but only if the Comparative Monitoring Audit Leak Percentage is at or above 0.5 percent).

     c.    <u>Final Corrective Action Plan</u>.  Hydrite shall submit a Final CAP to EPA by no later than 365 Days after the Effective Date.

        (1)    If all corrective actions have been completed by the time Hydrite submits its Final CAP, then the Final CAP shall include a final certification of completion as described in Subparagraph 17.d.

        (2)    If all corrective actions have not been completed by the time Hydrite submits its Final CAP, then the CAP shall include: (i) Hydrite's certification of completion for each corrective action item completed to date; and (ii) Hydrite's explanation of the reasons why any remaining corrective action items have not been completed, together with a schedule for prompt completion.

12

Hydrite shall promptly complete each remaining corrective action item. Hydrite shall submit a final certification of completion as described in Subparagraph 17.d by no later than 30 Days after completing all remaining action items.

d. <u>Certification of Completion</u>. In accordance with Subparagraph 17.c, Hydrite shall submit a final certificate of completion. Hydrite shall certify to EPA that, to the signer's best knowledge and belief formed after reasonable inquiry: (i) except as otherwise identified, the Facility is in compliance with all applicable LDAR regulations and the LDAR Program; and (ii) Hydrite has completed all corrective action pursuant to a CAP. To the extent that Hydrite cannot make the certification in all respects, it shall specifically identify any deviations.

18. <u>Repair Program</u>. Commencing 180 Days after the Effective Date, Hydrite shall perform repairs to address any leaks from equipment in HAP Service above the thresholds described in this Paragraph during monitoring performed at the Facility, including leaks detected during the Annual Leak Detection required by Paragraph 19 in accordance with the following:

a. For all components except pumps and agitators, Hydrite must make a first attempt at repair within five days of detection for each leak that is 500 ppm above background, and must make a final repair within 15 days of detection, except for any components that require delay of repair.

b. For all pumps, Hydrite must make a first attempt at repair within five days of detection for each leak that is 2,000 ppm above background, and must make a final repair within 15 days of detection, except for any components that require delay of repair.

c. For agitators, Hydrite must make a first attempt at repair within five days of detection for each leak that is 2,000 ppm above background prior to EPA's approval of

13

the Demonstration Period Report.  Following approval of the Demonstration Period

Report, Hydrite must make a first attempt at repair within five days of detection for each

leak at an agitator that is more than 10,000 ppm above background, and must make a

final repair within 15 days of detection, except for any components that require delay of

repair.

19.    Annual Leak Detection for Equipment in HAP Service.  Commencing in the first

Calendar Quarter after completion of the LDAR Audit, completion of all corrective actions

required by a Final CAP, and submittal of any final certification of completion required by

Paragraphs 15-17, Hydrite shall begin conducting annual leak detection ("Annual Leak

Detection") using EPA Method 21 – if not required more frequently by any Federal, State, or

local standard – for components in HAP Service, including valves, connectors, pumps, agitators,

instrumentation systems, open-ended lines, compressors, insulated valves subject to regulation

under RCRA Subpart BB and/or NESHAP Subpart DD, and difficult-to-monitor ("DTM")

equipment subject to regulation under RCRA Subpart BB and/or NESHAP Subpart DD to ensure

emissions from such equipment are included in the total HAP(s) emissions calculation for the

Facility.  Hydrite shall also perform Annual Leak Detection for manways in HAP Service and for

pressure relief devices that are in HAP Service but do not meet the definition of pressure relief

devices under NESHAP Subpart DD or NESHAP Subpart H.  In performing its Annual Leak

Detection:

a.    Hydrite shall conduct annual monitoring of HAP components that are

classified as DTM that are required to be monitored annually under RCRA Subpart BB

and/or NESHAP Subpart DD;

b.    Hydrite can elect to monitor other DTM/unsafe-to-monitor components in

HAP Service that are not otherwise required to be monitored; and

     c.      For fully insulated valves on equipment subject to regulation under RCRA Subpart BB and/or NESHAP Subpart DD, Hydrite shall ensure access to the valve stem for monitoring to comply with RCRA Subpart BB and/or NESHAP Subpart DD requirements.  For other insulated valves, Hydrite shall conduct monitoring to the extent the valve stem is accessible.

B.   <u>Minor Source Demonstration</u>

20.     <u>Demonstration Period</u>.  Within the first Calendar Quarter after completion of the LDAR Audit, completion of all corrective actions required by the Final CAP, and submittal of any final certification of completion required by Paragraphs 15-17, Hydrite shall begin conducting a twelve-month program to demonstrate that the Facility is a minor source of HAP emissions (the "Demonstration Period"), to ensure that:  (i) all HAP emissions are included in the Facility's emissions calculations; and (ii) no single HAP emitted at the Facility equals or exceeds 10 tpy and combined emissions of HAPs do not equal or exceed 25 tpy.  During the Demonstration Period, Hydrite will track and record all HAP emissions – on a monthly basis for twelve consecutive months – in accordance with the Minor Source Demonstration Requirements specified in Appendix B to this Consent Decree.

21.     If emissions information obtained during the initial Demonstration Period at any point shows that emissions of a single HAP from the Facility were 10 tpy or more *or* combined emissions of HAPs from the Facility were 25 tpy or more, then Hydrite shall submit prompt written notice to EPA that Hydrite is electing one of the following options:

     a.      Hydrite shall immediately comply with the applicable major source NESHAP(s); *or*

     b.      Hydrite shall cease the initial Demonstration Period to attempt one additional twelve-month Demonstration Period in accordance with the Minor Source

Demonstration Requirements specified in Appendix B to this Consent Decree (a "Second Demonstration Period").

If emissions information obtained during a Second Demonstration Period at any point shows that emissions of a single HAP from the Facility were 10 tpy or more *or* combined emissions of HAPs from the Facility were 25 tpy or more, then Hydrite shall submit prompt written notice to EPA, and Hydrite shall immediately comply with applicable major source NESHAP(s).

22.     Demonstration Period Report.  If emissions information obtained during an initial Demonstration Period or a Second Demonstration Period shows that emissions of no single HAP emitted at the Facility equaled or exceeded 10 tons per year (tpy) and combined emissions of HAPs did not equal or exceed 25 tpy, then Hydrite shall submit a Demonstration Period Report within 90 Days after the end of the Demonstration Period.  The Demonstration Period Report shall summarize the emissions monitoring and emissions estimation information obtained in the assessment, including relevant underlying data and calculations, consistent with the Minor Source Demonstration Requirements specified in Appendix B to this Consent Decree.  The Demonstration Period Report shall be subject to U.S.EPA review and approval in accordance with Consent Decree Subsection V.E.

C.   Other Compliance Requirements.

23.     Measuring VOC Emissions from Carbon Drums.  Whenever Hydrite is required to monitor VOC emissions from carbon drums under its Permits (including under Condition C.1.b.(2) of its Current Operation Permit), Hydrite shall use a flame ionization detector ("FID") for all chemicals that meet the response factor requirements of Section 8 of EPA Method 21.  For other chemicals, Hydrite shall use another equivalent monitoring technology that complies with EPA Method 21.

16

24.     <u>Performance Test of South Scrubber</u>.  By no later than 180 Days after the Effective Date, unless EPA agrees in writing to an extension of this date, Hydrite shall conduct a performance test on the South Scrubber in accordance with approved EPA Methods.  At least 20 business days in advance of the scheduled test, Hydrite shall submit a test protocol to EPA for its approval.  This protocol shall include the approved EPA Method(s) to be used and proposed operating conditions.  EPA shall timely review and approve this test protocol consistent with the scheduled test date.  The purpose of this performance test is to establish the control efficiency for the South Scrubber with a minimum water flow rate for parametric monitoring.

        a.      If the performance test demonstrates a control efficiency of 85% or greater, Hydrite shall incorporate the minimum water flow rate established by the performance test into a federally enforceable non-Title V permit for the Facility.

        b.      If the performance test demonstrates a control efficiency of less than 85%, Hydrite shall incorporate the control efficiency from the performance test and the minimum water flow rate established into a federally enforceable non-Title V permit for the Facility.

D.  <u>Incorporation of Requirements Into Federally Enforceable Permits</u>

25.     <u>Permits Needed to Meet Compliance Obligations</u>.  If any compliance obligation under this Section V (Injunctive Relief) requires Hydrite to obtain a federal, state, or local permit or approval, Hydrite shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.  Hydrite may seek relief under the provisions of Section VIII (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Hydrite has submitted timely and complete applications and has taken all other actions necessary to obtain such permits or approvals.

26.  <u>Inclusion of Practically Enforceable Requirements in Operation Permits</u>.

    a.    Prior to termination of this Consent Decree, Hydrite shall submit to State permitting authorities complete applications, amendments and/or supplements to incorporate as "applicable requirements" the limits, standards, and requirements listed in Subparagraph 26.b into the Facility's operation permit.  If required by the final rule issued by EPA related to the Reclassification of Major Sources as Area Sources under Section 112 of the CAA, Hydrite shall submit an application to incorporate the items in Subparagraph 26.b into a non-Title V permit to ensure that those limits, standards, and requirements will survive termination of this Consent Decree.

    b.    The following emission limits, standards, and requirements shall be incorporated into permits in accordance with Subparagraph 26.a:

    (1)    The requirements concerning the LDAR Program Description and Daily Certification, in Paragraphs 12-13;

    (2)    The LDAR Repair Program and Annual Leak Detection requirements in Paragraphs 18-19;

    (3)    The requirement to comply with applicable major source NESHAP(s) under Paragraph 21 if emissions information obtained at any point shows that emissions of a single HAP from the Facility were 10 tpy or more or combined emissions of HAPs from the Facility were 25 tpy or more; and

    (4)    The requirement to:  (i) sustain a minimum water flow rate in the South Scrubber as referenced in Subparagraph 24.a; or (ii) sustain a control efficiency and a minimum water flow rate determined in a performance test of the South Scrubber as referenced in Subparagraph 24.b.

18

E. <u>Approval of Deliverables</u>.

27.     After submittal of any plan, report, or other item that is required to be submitted pursuant to this Consent Decree, EPA shall in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

28.     If the submission is approved pursuant to Paragraph 27, Hydrite shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved.  If the submission is conditionally approved or approved only in part pursuant to Paragraph 27 (b) or (c), Hydrite shall, upon written direction from EPA, take all actions required by the approved plan, report, or other item that EPA determines are technically severable from any disapproved portions, subject to Hydrite's right to dispute only the specified conditions or the disapproved portions, under Section IX (Dispute Resolution).

29.     If the submission is disapproved in whole or in part pursuant to Paragraph 27(c) or (d), Hydrite shall, within 45 Days or such other time as the Parties agree to in writing, correct all identified deficiencies and resubmit the plan, report, or other item, or the disapproved portion thereof, for approval, in accordance with the preceding Paragraphs.  If the resubmission is approved in whole or in part, Hydrite shall proceed in accordance with the preceding Paragraph.

30.     If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA may again require Hydrite to correct any deficiencies, in accordance with the preceding Paragraphs, or may itself correct any deficiencies, subject to Hydrite's right to invoke Dispute Resolution and the right of EPA to seek stipulated penalties as provided in Paragraph 31 and Sections VII (Stipulated Penalties) and IX (Dispute Resolution).

31.     Any stipulated penalties applicable to the original submission, as provided in Section VII, shall accrue during the 45-Day period or other specified period during which the original plan is being revised, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Hydrite's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable after receipt of a written demand in accordance with Paragraph 43 notwithstanding any subsequent resubmission.

## VI.     REPORTING REQUIREMENTS

32.     Hydrite shall submit semi-annual reports as provided by this Paragraph.

a.     <u>Schedule for Submission of Semi-Annual Reports</u>.  After the Effective Date of this Consent Decree until approval of the Demonstration Period Report, Hydrite shall submit semi-annual reports.  The initial semi-annual report shall be due on either: (i) March 1 of the year after the Effective Date, if the Effective Date is between July 1 and December 31 of the preceding year; or (ii) September 1 of the year of the Effective Date, if the Effective Date is between January 1 and June 30.  The initial report shall cover the period between the Effective Date and the end of the applicable reporting period (*e.g.*, if the Effective Date is September 15, the report shall be due on March 1 and cover the period between September 15 and December 31).  Until approval of the Demonstration Period Report, each subsequent report shall be due on September 1 and March 1 and shall cover the half year period between either, respectively, January 1 and June 30 or July 1 and December 31.

b.     <u>Report Contents</u>.  Each report shall describe the status of any compliance measures required by Section V (Injunctive Relief) and any problems encountered or anticipated, together with implemented or proposed solutions.  Each report shall attach

20

copies of any reports to the State of Wisconsin concerning any Permit deviations during the semi-annual reporting period. Each report shall also include a description of any violation of the requirements of this Consent Decree and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the time the report is due, Hydrite shall so state in the report. Hydrite shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the day Hydrite becomes aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves Hydrite of its obligation to provide the notice required by Section VIII (Force Majeure).

33.     Whenever any violation of this Consent Decree or a deviation from requirements of Hydrite's Permits, or any other event affecting Hydrite's performance under this Decree, may pose an immediate threat to the public health or welfare or the environment, Hydrite shall notify EPA orally or by electronic or facsimile transmission as soon as possible, but no later than the next business day after Hydrite first knew of the deviation or event. This procedure is in addition to the requirements set forth in the preceding Paragraph.

34.     All reports shall be submitted to the persons designated in Section XIII (Notices).

35.     Each report submitted by Hydrite under this Section shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

36.     The reporting requirements of this Consent Decree do not relieve Hydrite of any reporting obligations required by the CAA or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

37.     Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VII.     STIPULATED PENALTIES

38.     Hydrite shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified below, unless excused under Section VIII (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

39.     Late Payment of Civil Penalty.  If Hydrite fails to pay the civil penalty required to be paid under Section IV (Civil Penalty) when due, Hydrite shall pay a stipulated penalty of 0.10% of the unpaid principal amount per Day for each Day that the payment is late.

40.     Injunctive Relief.  The following stipulated penalties shall accrue per violation per Day for each violation of the requirements identified in Section V (Injunctive Relief) and this Paragraph 40:

| Consent Decree Violation | | Stipulated Penalty | |
|---|---|---|---|
| a. | Violation of LDAR Program Description Requirements.  For failure to comply with any requirement of Paragraph 12. | Period of Delay or Non-Compliance<br>Days 1–30<br>Days 31–60<br>Days 61 and later | Penalty per Day<br>$100<br>$200<br>$500 |

22

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| b. Violation of Daily Certification Requirements. For a monitoring technician's failure to complete a certification on the day monitoring occurred, as required by Paragraph 13. | $100 per failure per technician. |
| c. Violation of QA/QC Requirements. For failure to comply with any requirement of Paragraph 14. | $500 for each instance of non-compliance, not to exceed $10,000 for the relevant Calendar Quarter |
| d. Violation of LDAR Audit Requirements. For failure to complete an LDAR Audit in accordance with the requirements of Paragraphs 15 and 16. | Period of Delay or Non-Compliance    Penalty per Day<br>Days 1–30    $300<br>Days 31–60    $400<br>Days 61 and later    $500 |
| e. Violation of LDAR Audit Report and Corrective Action Plan Requirements. For failure to comply with any requirement of Paragraph 17. | Period of Delay or Non-Compliance    Penalty per Day<br>Days 1–30    $500<br>Days 31and later    $1,000 |
| f. Violation of Repair Program Requirements.<br><br>(1) For failure to comply with any first attempt at repair requirement of Paragraph 18.<br><br>(2) For failure to comply with any final attempt at repair requirement of Paragraph 18. | <br><br>(1) $150 per Day, per component, not to exceed $1,500 per leaking component.<br><br>(2) For components other than pumps and agitators: $300 per Day, per component, not to exceed $37,500 per leaking component.<br>For pumps and agitators: $1,200 per Day, per component, not to exceed $150,000 per leaking component. |
| g. Violation of Annual Leak Detection Requirements. For failure to comply with any requirement of Paragraph 19. | $100 per component per missed monitoring event, not to exceed $25,000 per 30-Day period per process unit. |
| h. Violation of Minor Source Demonstration Requirements. For failure to submit a Demonstration Period Report (as required by Paragraph 22) documenting compliance with all Demonstration Period requirements (as specified by Paragraph 20 and Subparagraph 21.b). | Period of Delay or Non-Compliance    Penalty per Day<br>Days 1–30    $500<br>Days 31–60    $750<br>Days 61 and later    $1,000 |
| i. Violation of Carbon Drum Monitoring Equipment Requirements. For failure to monitor carbon drums for total VOC emissions as required by Paragraph 23 | $100 per Day, per carbon drum. |
| j. Violation of Requirements Regarding Performance Test of South Scrubber. For failure to complete a Performance Test as required by Paragraph 24. | Period of Delay or Non-Compliance    Penalty per Day<br>Days 1–30    $500<br>Days 31–60    $750<br>Days 61 and later    $1,000 |

23

| Consent Decree Violation | Stipulated Penalty | |
|---|---|---|
| k.  Violation of Permit Application Requirements under Paragraph 26. For failure to submit an application for a permit in accordance with the requirements of Paragraph 26. | Period of Delay or Non-Compliance | Penalty per Day |
| | Days 1–30 | $500 |
| | Days 31–60 | $750 |
| | Days 61 and later | $1,000 |

41.   <u>Semi-Annual Reporting Requirements</u>.  The following stipulated penalties shall accrue per violation per Day for each violation of the reporting requirements of Section VI:

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| <u>Violation of Semi-Annual Report Requirements</u>. For failure to submit a Semi-Annual Report as required by Paragraph 32. | $500 per Day for the first 30 Days of noncompliance; and $1000 per Day thereafter. |

42.   Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

43.   Hydrite shall pay any stipulated penalty within 30 Days of receiving the United States' written demand.

44.   The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

45.   Stipulated penalties shall continue to accrue as provided in Paragraph 42 during any Dispute Resolution but need not be paid until the following:

a.   If the dispute is resolved by agreement of the Parties or by a decision of EPA that is not appealed to the Court, Hydrite shall pay accrued penalties determined to be owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of EPA's decision or order.

24

b.     If the dispute is appealed to the Court and the United States prevails in whole or in part, Hydrite shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

c.     If any Party appeals the District Court's decision, Hydrite shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

46.     Hydrite shall pay stipulated penalties owing to the United States in the manner set forth in and with the confirmation notices required by Paragraph 9, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

47.     If Hydrite fails to pay stipulated penalties according to the terms of this Consent Decree, Hydrite shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

48.     The payment of penalties and interest, if any, shall not alter in any way Hydrite's obligation to complete the performance of the requirements of this Consent Decree.

49.     <u>Non-Exclusivity of Remedy</u>.  Stipulated penalties are not the United States' exclusive remedy for violations of this Consent Decree, including for any non-compliance with Paragraph 21.  Subject to the provisions of Section XI (Effect of Settlement/Reservation of Rights), the United States expressly reserves the right to seek any other relief it deems appropriate for Hydrite's violation of this Decree or applicable law, including but not limited to an action against Hydrite for statutory penalties, additional injunctive relief, mitigation or offset

25

measures, and/or contempt.  However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

VIII.   FORCE MAJEURE

50.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Hydrite, any entity controlled by Hydrite, or Hydrite's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Hydrite's best efforts to fulfill the obligation.  The requirement that Hydrite exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized.  "Force Majeure" does not include Hydrite's financial inability to perform any obligation under this Consent Decree.

51.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, for which Hydrite intends or may intend to assert a claim of Force Majeure, Hydrite shall provide notice by an electronic mail message to nelson.victoria@epa.gov and mcauliffe.mary@epa.gov within seven days of when Hydrite first knew that the event might cause a delay.  Within 15 Days thereafter, Hydrite shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Hydrite's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Hydrite, such event may cause or contribute to an endangerment to public health, welfare or the environment.

26

Hydrite shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure.  Failure to comply with the above requirements shall preclude Defendant from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.  Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or should have known.

52.     If EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation.  EPA will notify Hydrite in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

53.     If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Hydrite in writing of its decision.

54.     If Hydrite elects to invoke the dispute resolution procedures set forth in Section IX (Dispute Resolution), it shall do so no later than 30 Days after receipt of EPA's notice.  In any such proceeding, Hydrite shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Hydrite complied with the requirements of Paragraphs 50 and 51.  If Hydrite carries this burden, the delay at issue shall be deemed not to be a violation by Hydrite of the affected obligation of this Consent Decree.

27

## IX.    DISPUTE RESOLUTION

55.    Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  Hydrite's failure to seek resolution of a dispute under this Section shall preclude Hydrite from raising any such issue as a defense to an action by the United States to enforce any obligation of Hydrite arising under this Decree.

56.    Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Hydrite sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed 21 Days from the date the dispute arises, unless that period is modified by written agreement.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 90 Days after the conclusion of the informal negotiation period, Hydrite invokes formal dispute resolution procedures as set forth below.

57.    Formal Dispute Resolution.  Hydrite shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Hydrite's position and any supporting documentation relied upon by Hydrite.

58.    The United States shall serve its Statement of Position within 45 Days of receipt of Hydrite's Statement of Position.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.  The United States' Statement of

28

Position shall be binding on Hydrite, unless Hydrite files a motion for judicial review of the dispute in accordance with the following Paragraph.

59.     Hydrite may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XIII (Notices), a motion requesting judicial resolution of the dispute.  The motion must be filed within 30 Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Hydrite's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

60.     The United States shall respond to Hydrite's motion within the time period allowed by the Local Rules of this Court.  Hydrite may file a reply memorandum, to the extent permitted by the Local Rules.

61.     Standard of Review.  Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 57, Hydrite shall have the burden of demonstrating that its position complies with this Consent Decree, and that Hydrite is entitled to relief under applicable principles of law.  The United States reserves the right to argue that its position is reviewable only on the administrative record and must be upheld unless arbitrary and capricious or otherwise not in accordance with law.

62.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Hydrite under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 45.  If

29

Hydrite does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VII (Stipulated Penalties).

## X.    INFORMATION COLLECTION AND RETENTION

63.     The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

       a.      monitor the progress of activities required under this Consent Decree;

       b.      verify any data or information submitted to the United States or the State in accordance with the terms of this Consent Decree or the Permits;

       c.      obtain samples and, upon request, splits of any samples taken by Hydrite or its representatives, contractors, or consultants;

       d.      obtain documentary evidence, including photographs and similar data; and

       e.      assess Hydrite's compliance with this Consent Decree.

64.     Upon request, Hydrite shall provide EPA or its authorized representatives splits of any samples taken by Hydrite.  Upon request, EPA shall provide Hydrite splits of any samples taken by EPA.

65.     Until two years after the termination of this Consent Decree, Hydrite shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Hydrite's performance of its obligations under this Consent Decree.  This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United

States, Hydrite shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

66.     Hydrite may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Hydrite asserts such a privilege, it shall provide the following:  (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Hydrite.  However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

67.     Hydrite may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2.  As to any information that Hydrite seeks to protect as CBI, Hydrite shall follow the procedures set forth in 40 C.F.R. Part 2.

68.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Hydrite to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

XI.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69.     This Consent Decree resolves the civil claims of the United States for the violations alleged in the Complaint filed in this action through the Date of Lodging.  This

31

Consent Decree also resolves the potential civil claims of the United States for the violations alleged in the EPA Violation Notice through the Date of Lodging.

70.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree.  This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the CAA or implementing regulations, or under other federal or state laws, regulations, or permit conditions.  The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, the Facility, whether related to the violations addressed in this Consent Decree or otherwise.

71.     In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, other appropriate relief relating to the Facility, Hydrite shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 69.

72.     This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations.  Hydrite is responsible for achieving and maintaining compliance with all applicable federal, state, and local laws, regulations, and permits; and Hydrite's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein.  The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Hydrite's compliance with any aspect of this Consent Decree will result in compliance with

provisions of the CAA, 42 U.S.C. § 7401, et seq., or with any other provisions of federal, state, or local laws, regulations, or permits.

73.    This Consent Decree does not limit or affect the rights of Hydrite or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Hydrite, except as otherwise provided by law.

74.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XII.    COSTS

75.    The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Hydrite.

## XIII.    NOTICES

76.    Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

As to the United States by email:    eescdcopy.enrd@usdoj.gov
Re: DJ # 90-5-2-1-12229

As to the United States by mail:    EES Case Management Unit
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Re: DJ # 90-5-2-1-12229

As to EPA by email:    r5airenforcement@epa.gov
mcauliffe.mary@epa.gov

As to Hydrite:

Thadd Stankowski
General Counsel
Hydrite Chemical Company
300 N. Patrick Blvd
Brookfield, WI 53045
legal@hydrite.com

Tom Miazga
Executive Director of SQRA
Hydrite Chemical Company
300 N. Patrick Blvd
Brookfield, WI 53045

77.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

78.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, electronically or otherwise, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XIV.   EFFECTIVE DATE

79.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XV.   RETENTION OF JURISDICTION

80.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections IX and XVI, or effectuating or enforcing compliance with the terms of this Decree.

## XVI.   MODIFICATION

81.     The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Where the

modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

82.     Any disputes concerning modification of this Decree shall be resolved pursuant to Section IX (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 61, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVII.  TERMINATION

83.     After Hydrite has completed the requirements of Section V (Injunctive Relief), has maintained continuous satisfactory compliance with this Consent Decree for at least 24 months, and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Hydrite may serve upon the United States a Request for Termination, stating that Hydrite has satisfied those requirements, together with all necessary supporting documentation.

84.     Following receipt by the United States of Hydrite's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Hydrite has satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

85.     If the United States does not agree that the Decree may be terminated, Hydrite may invoke Dispute Resolution under Section IX.  However, Hydrite shall not seek Dispute Resolution of any dispute regarding termination until at least 90 Days after service of its Request for Termination.

## XVIII. 26 U.S.C. § 126(f)(2)(A)(ii) IDENTIFICATION

86.     For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the

Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section II (Applicability),

Paragraph 4; Section V (Injunctive Relief), Paragraphs 12-27; Section VI (Reporting

Requirements), Paragraphs 32 and 34-35; and Section X (Information Collection and Retention),

Paragraphs 63-66, is restitution or required to come into compliance with law.

## XIX.   PUBLIC PARTICIPATION

87.     This Consent Decree shall be lodged with the Court for a period of not less than

30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States

reserves the right to withdraw or withhold its consent if the comments regarding the Consent

Decree disclose facts or considerations indicating that the Consent Decree is inappropriate,

improper, or inadequate.  Hydrite consents to entry of this Consent Decree without further notice

and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to

challenge any provision of the Decree, unless the United States has notified Hydrite in writing

that it no longer supports entry of the Decree.

## XX.   SIGNATORIES/SERVICE

88.     Each undersigned representative of Hydrite and the Environment and Natural

Resources Division of the Department of Justice certifies that he or she is fully authorized to

enter into the terms and conditions of this Consent Decree and to execute and legally bind the

Party he or she represents to this document.

89.     This Consent Decree may be signed in counterparts, and its validity shall not be

challenged on that basis.  Hydrite agrees to accept service of process by mail with respect to all

matters arising under or relating to this Consent Decree and to waive the formal service

requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any

applicable Local Rules of this Court including, but not limited to, service of a summons.  Hydrite need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXI.   INTEGRATION

90.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  Other than deliverables that are subsequently submitted and approved pursuant to this Decree, the Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXII.  APPENDICES

91.     The following Appendices are attached to and part of this Consent Decree:

"Appendix A" is the June 2017 Notice of Violation and Finding of Violation issued to Hydrite by EPA; and

"Appendix B" is the Minor Source Demonstration Requirements.

## XXIII. FINAL JUDGMENT

92.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, the State, and Hydrite.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

Dated and entered this ___22ND___ day of ___JANUARY___, 20_21_.

_____
UNITED STATES DISTRICT JUDGE

Entered this 22nd day of January, 2021.

s/ K. Frederickson, Deputy Clerk
PETER A. OPPENEER
CLERK OF COURT

Signature Page for Consent Decree in *United States v. Hydrite Chemical Co.* (W.D. Wis.)

FOR THE UNITED STATES OF AMERICA:

KAREN S. DWORKIN
Deputy Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

RANDALL STONE    Digitally signed by RANDALL
                 STONE
                 Date: 2020.10.13 15:29:02 -04'00'

_____         _____
Date                    RANDALL M. STONE
                        Senior Attorney
                        Environmental Enforcement Section
                        U.S. Department of Justice
                        P.O. Box 7611
                        Washington, DC  20044-7611
                        Tel. No.:        (202) 514-1308
                        Fax No.:        (202) 616-6584
                        E-mail:  randall.stone@usdoj.gov

SCOTT C. BLADER
United States Attorney
Western District of Wisconsin

LESLIE K. HERJE
Assistant United States Attorney
Western District of Wisconsin
222 West Washington Ave., Suite 700
Madison, WI  53703
Tel. No.:        (608) 264-5158

Signature Page for Consent Decree in *United States v. Hydrite Chemical Co.* (W.D. Wis.)

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

T. Leverett Nelson

Digitally signed by T. Leverett Nelson
Date: 2020.09.29 14:05:30 -05'00'

T. LEVERETT NELSON
Regional Counsel
U.S. Environmental Protection Agency, Region 5

Signature Page for Consent Decree in *United States v. Hydrite Chemical Co.* (W.D. Wis.)

FOR HYDRITE CHEMICAL CO.

9/22/2020
Date

Thadd Stankowski
General Counsel